# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| JAMIE ALLEN WESTFALL AND | ) | CASE NO. 06-60297 |
| ANGELA ANN WESTFALL, | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtors. | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | |

Before the court are two objections to confirmation of debtors' fourth amended chapter 13 plan. The plan proposed by debtors attempts to cram down (to reduce to a value other than the balance owed) secured liens on two automobiles, each purchased within nine hundred ten (910) days of debtors' filing, where a portion of the loan proceeds was used to pay off negative equity (the amount by which the debt securing the traded vehicle exceeded the trade-in value) on trade-in vehicles. Creditor Nuvell Credit Corporation (hereafter "Nuvell") filed its objection to confirmation on August 28, 2006; Creditor WFS Financial, Inc. (hereafter "WFS")[1] filed its objection on July 28, 2006. Following a hearing, the court established a briefing schedule. The chapter 13 trustee, Toby L. Rosen, and both creditors have filed briefs in support of their positions on the objections to confirmation.

The court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

Debtors filed a chapter 13 petition on March 13, 2006. In the fourth amended plan, filed July 9, 2006, debtors proposed to pay WFS a secured value of $18,874.03, plus interest at 8%, on a 2005 Chevrolet Impala. WFS's proof of claim, filed April 6, 2006, alleges the total amount owed on the loan is $25,631.03. Debtors obtained a loan on the Impala on or about May 31, 2005, in the amount of $26,189.49, plus interest at 12.29% annually. The sales contract indicates that part of the loan was used to pay $6,757.62 for negative equity on a 2003 Chevrolet Cavalier traded in by debtors. The WFS loan is secured by a lien on the title to the vehicle.

Nuvell is a secured creditor by virtue of a lien on the title to debtors' 2005 Chevrolet Silverado. The Nuvell debt was incurred on or about May 31, 2005 when debtors borrowed approximately $18,723.65 for the Silverado, related expenses, and approximately $3,588.47 of negative equity on a Chevrolet Blazer traded by debtors. Nuvell filed a proof of claim on

---

[1] Nuvell and WFS may also hereafter be referred to as "creditors."

March 15, 2006 alleging it is owed $18,289.89. Debtors propose to pay Nuvell $14,701.89, plus interest at 7%, for the 2005 Chevrolet Silverado under debtors' fourth amended plan.

The parties do not dispute that the vehicles were purchased within the 910 days prior to debtors' filing, nor is there a dispute that the vehicles were purchased for debtors' personal use.

## **LEGAL BACKGROUND AND PARTIES' ARGUMENTS**

In order to confirm a plan, chapter 13 debtors must abide by the directives set forth in 11 U.S.C. § 1325. Included in section 1325(a) are guidelines for treatment of secured claims:

    (5)    with respect to each allowed secured claim provided for by the plan--

        (A)    the holder of such claim has accepted the plan;

        (B)    (i)    the plan provides that--

                (I)    the holder of such claim retain the lien securing such claim until the earlier of--

                      (aa)    the payment of the underlying debt determined under nonbankruptcy law; or

                      (bb)    discharge under section 1328; and

                (II)    if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;

            (ii)    the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

            (iii)    if--

                (I)    property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

                (II)    the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

> (C) the debtor surrenders the property securing such claim to holder.

11 U.S.C. § 1325.[2] In accordance with this section, a court can confirm a plan in one of three instances: the creditor accepted the plan; the creditor is receiving payment on its secured claim in accordance with 11 U.S.C. § 1325(a)(5)(B), or the debtor surrenders the collateral. In this case, the creditors have not agreed to the plan, nor does the plan propose to surrender the collateral. Therefore, the court must find that the plan conforms to the required payments set forth in section 1325(a)(5)(B) before a confirmation order is entered.

Section 1325(a)(5)(B) also involves three considerations: retention of the lien, payment of at least the allowed amount of the claim, and equal monthly payments constituting adequate protection. In the cases presently before the court, there are no arguments regarding subsections (i) or (iii), but the issue raised involves subsection (ii). The trustee argues that debtors' proposed cramdown is payment in full of the allowed claim. WFS and Nuvell, for the reasons discussed below, argue that the plan does not pay the allowed amount of their respective claims.

In addition to the three requirements found in section 1325(a)(5)(B), there is also language, following 1325(a)(9) and now commonly referred to as the "hanging paragraph," which offers further explanation of secured claims falling under section 1325(a)(5) which are referred to as "910 claims." The hanging paragraph states, in its entirety:

> For purposes of paragraph (5), section 506 shall not apply
> to a claim described in that paragraph if the creditor has a
> purchase money security interest securing the debt that is
> the subject of the claim, the debt was incurred within the
> 910-day [sic] preceding the date of the filing of the petition,
> and the collateral for that debt consists of a motor vehicle
> (as defined in section 30102 of title 49) acquired for the
> personal use of the debtor, or if the collateral for that debt
> consists of any other thing of value, if the debt was
> incurred during the 1-year period preceding that filing.

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act (hereafter "BAPCPA"), debtors could, under authority of 11 U.S.C. § 506, bifurcate claims into secured and unsecured portions based on the value of the collateral. To the extent the claim was undersecured, debtor could pay that portion of the claim as an unsecured claim. This is commonly referred to as the "cramdown" of a claim.

Following enactment of BAPCPA, many courts have had an opportunity to expound on the meaning and effect of the hanging paragraph. *See* In re Trejos, 352 B.R. 249, 253 (Bankr. D. Nev. 2006) (citing myriad cases in footnote 6). It is clear that the hanging paragraph prevents bifurcation of certain claims under the authority of 11 U.S.C. § 506. To

---

[2] There is no argument that WFS and Nuvell hold secured claims, nor is it an issue of whether the claims are allowable. Rather, the issue is the payments the creditors are entitled to receive on their respective claims, the allowed amount of the claims.

be excepted from section 506 bifurcation, a vehicle claim must: (1) be a purchase money security interest; (2) arise from a debt incurred within the 910-day period preceding the bankruptcy filing; and (3) secure collateral purchased for the personal use of the debtor. Here, there is no dispute that the vehicles were purchased for the personal use of debtors in the 910 day period preceding the bankruptcy filing. Consequently, the crux of the matter is whether a purchase money security interest secures the debt. The inquiry focuses on what constitutes a purchase money security interest, and more specifically whether payment of negative equity from a trade is part of the purchase money security interest.

It is trustee's position that creditors do not have a purchase money security interest in the amount used to pay off the negative equity on the trade-in. Trustee's view is that the purchase money security interest only extends to the amount used to purchase the vehicle. According to the trustee, two separate transactions took place with execution of each of the retail sales installment contracts: the sale of debtors' used vehicle and the purchase of the new vehicle. Trustee points to O.R.C. § 1309.103, and the comments thereto, and argues that the purchase money security interests only arise to the extent that the value given by a creditor has a "close nexus" to the procurement of the collateral. Under this view, the amounts paid on the negative equity did not constitute value extended by creditors for the new vehicle purchases.

Trustee argues that the amount paid for the purchase represents the purchase money security interest and the amount paid on the negative equity is the nonpurchase money interest. Since there are both nonpurchase money security interests and purchase money security interests involved in the transaction, the claim can be divided into secured and unsecured positions. Under trustee's argument, the secured, or purchase money position, is not subject to cramdown. However, the unsecured, or nonpurchase money, portion is subject to cramdown. Further, trustee argues that prepetition payments should have been applied pro rata to each position, which affect the unsecured and secured claim amounts for the debts.

WFS and Nuvell argue that they have a purchase money security interest for the entire claim in the respective vehicles, making the hanging paragraph applicable to prevent the bifurcated treatment proposed by debtors in the plan. According to creditors, debtors would not have been able to obtain the loans unless the existing vehicle loans were paid off, so any money used to put the collateral in the hands of the purchaser qualifies as purchase money. Thus, creditors argue that there is a close nexus between the value paid and acquisition of the collateral, contrary to trustee's argument. Since there is a close nexus, creditors maintain they are entitled to payment in full on their secured claims.

The issue is one of first impression for the court.

## LAW AND ANALYSIS

I. **Current Interpretations**

Although "purchase money security interest" is a term of art in commercial and

bankruptcy law, and the term "nonpurchase-money[3] security interest" is utilized in the Bankruptcy Code, *see* 11 U.S.C. § 522(f), the term is not a defined term within the Bankruptcy Code. *See* In re Price, 2007 WL 664534 (Bankr. E.D.N.C. March 6, 2007) (reporter citation not yet available); Trejos, 352 B.R. 249; Vega, 344 B.R. 616.

In the breach, courts seeking a definition of the term "purchase money" turn to state law. *See* Price, 2007 WL 664534; Vega, 344 B.R. 616; In re White, 352 B.R. 633 (Bankr. E.D. La. 2006). Here, the applicable state law is the Uniform Commercial Code provisions adopted into the Ohio Revised Code.[4] *See* O.R.C. § 1309.103. The following illustrates how the subject would be treated by following Ohio law.

    (A)    As used in this section:

        (1)    "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and

        (2)    "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

---

[3] "Purchase money" is found with hyphenation and without hyphenation in the text of this decision. The hyphenated version is used when quoting statutory law where the language appears with a hyphen; otherwise, a non-hyphenated version is used.

[4] This is one of many points at which BAPCPA's amendments to 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") create uncertainty. In this particular instance, the most critical term is undefined. Courts have immediately turned to state law to define a term that easily could be defined for the limited purpose of use in the Bankruptcy Code. This does not appear to be an instance in which it is legally necessary to use state property law, but one in which state law is used to fill the void. A uniform federal definition for purposes of chapter 13 appears to do no violence to state law. For example, state law must be used to determine whether a security interest is valid. There cannot be a separate state and federal law on what is a security interest or commercial certainty would be lost. Whether something was secured should not depend on whether one is in state or federal court. This would cause commercial chaos. In the instant matter, no such problem arises because the term would be defined solely for its use within chapter 13 of the Bankruptcy Code, which is solely federal. There would be no unintended state law consequences. Thus, it is unclear whether courts in these matters turn to state law with the conviction that state law is binding, out of habit, or as a corollary that is not binding but is being followed in the absence of anything else. For example, would the bankruptcy courts immediately change the cramdown treatment if the state changed its definition of purchase money? The absence of defined terms results in a diminution of certainty and the logical working of the Bankruptcy Code as an organic whole.

> (B) A security interest in goods is a purchase-money security interest:
>
> > (1) To the extent that the goods are purchase-money collateral with respect to that security interest . . . .

O.R.C. § 1309.103. Thus, to understand when a security interest is a purchase money security interest, it is first necessary to define a purchase money obligation to define purchase money collateral, which will then provide a definition and understanding of a purchase money security interest.

The definition of "purchase-money obligation" covers transactions involving either a seller or a financier. "Price" is used in the context of a seller, while "value given" applies to transactions where a financier is providing money, or creditor, for a buyer to obtain goods. In all other aspects, the terms "price" and "value given" are virtually synonymous. Official Comment 3 offers additional insight into these terms:

> 3. "Purchase-Money Collateral"; "Purchase-Money Obligation"; "Purchase-Money Security Interest." Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if the debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

Clearly, "price" and "value given" may include an amount greater than the actual value of the collateral. In this case, the WFS sales contract indicates the "Cash Price" of the vehicle was $23,336.62, which includes the negative equity; the Nuvell contract lists the "Cash Price" at $18,539.93, which also includes negative equity. Relying on Official Comment 3, trustee essentially argues that the payment of the negative equity was not an "expense" incurred in order to obtain rights to the collateral and therefore does not have the requisite "close nexus" to be deemed a purchase money security interest. Consequently, trustee posits that the payment of the negative equity is not a purchase money obligation.

The court agrees that the payment of the negative equity was not legally required in order for debtors to acquire rights in the collateral. *See* Price, 2007 WL 664534, *5; In re Peaslee, 2006 WL 3759476 (Bankr. W.D.N.Y. December 22, 2006) (reporter citation not yet available); Vega, 344 B.R. 616. Although the creditors may have been unwilling to lend money on the purchase of the new vehicles barring payoff of the old loans, this is merely an accommodation which facilitates each transaction. Debtors were not required to pay off the existing loans to gain a legal interest in the vehicles. Thus, the "value given to enable" debtors to obtain rights in the new vehicles did not include the payoff of debtors obligations on the existing car loans. On the other hand, part of the value given by creditors did enable debtor to acquire rights to new vehicles, so there is a purchase money obligation flowing from the transactions even though the full amount of the loans do not qualify as purchase money obligations. *See* id.; *see also* White, 352 B.R. 633; In re Murray, 352 B.R. 340 (Bankr. M.D. Ga. 2006).

Creditors relied heavily on the unpublished Wible case from Judge John T. Laney, III, in the Middle District of Georgia for the proposition that the price did bear a sufficiently close nexus to qualify as part of the price, thereby making the entire amount of the loan subject to a purchase money security interest. In re Wible, Ch. 13 Case No. 06-40017 (Bankr. M.D. Ga. June 26, 2006) (unreported and unpublished). In Wible, Judge Laney found that the negative equity was part of the purchase money obligation and therefore was a purchase money security interest. Id. However, in a subsequent published opinion, Judge Laney offered additional explanation and analysis. *See* In re Graupner, 356 B.R. 907 (Bankr. M.D. Ga. 2006). In the Graupner case, he concluded that, under Georgia's Motor Vehicle Sales Financing Act ("MVSFA"), "price" includes the payment of negative equity, so reading MVSFA statute *in pari materiel* with the UCC provisions adopted into Georgia statutory law, "price" under the definition of purchase money obligation includes payment of negative equity. Id. at 920-21. As a result, the price paid, including the negative equity, was a purchase money obligation, resulting in a purchase money security interest, and therefore subject to the hanging paragraph. Id. Clearly, the reliance on Georgia statutory law makes Judge Laney's opinions easily distinguishable and therefore of little persuasive value.

Having found that there is a purchase money obligation, the next step is to apply this to the definition of "purchase-money collateral" which is collateral that secures a purchase money obligation. Since creditors have taken liens on the Silverado and Impala as collateral for their security interests, including at least a partial purchase money obligation, it follows that the vehicles qualify as purchase money collateral. Under Ohio Revised Code § 1309.103(B), a security interest in goods (the liens on the vehicles) is a purchase money security interest "to the extent that the goods are purchase money collateral with respect to that security interest." Consequently, the cars are purchase money collateral only to the extent of the purchase money obligations.

The result is that the obligation is a "mixed" transaction, divisible into purchase money and nonpurchase money elements. This approach is particularly appealing because it puts the parties in the same position as they would have been had there been two transactions: the payoff and satisfaction of the old loan and the purchase of a new car. Under this view, the payoff of the old loan, including the negative equity, was payment of an antecedent debt and comprises the nonpurchase money obligation. The extension of

credit for purchase of the new vehicle, and the subsequent security interest granted in the collateral, embodies the purchase money obligation. In this regard, creditors' arguments fail.

Having concluded that the transactions contained both purchase money and nonpurchase money components, the next question is the impact this conclusion has on application of the hanging paragraph. Trustee argues that bifurcation of the claim is permissible and urges the court to find that creditors have secured claims for the amount of the purchase money security interests and unsecured claims for the nonpurchase money transactions. Essentially, what trustee proposes is adoption of the "dual status" rule. However, trustee does not offer any authority to support her contention that the dual status rule is the appropriate rule under the Bankruptcy Code or under Ohio law.

To determine the appropriate rule, Ohio Revised Code §§ 1309.103(F) and (H) are helpful. In applicable part, these provisions provide:

> (F) In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as a purchase-money security interest, even if:
>
> > (1) The purchase-money collateral also secures an obligation that is not a purchase-money obligation.
> >
> > (2) Collateral that is not purchase-money collateral also secures the purchase-money obligation.
>
> \* \* \* \*
>
> (H) The limitation in divisions (E), (F), and (G) of this section to transactions other than consumer-goods transactions is intended to leave to a court the determination of the proper rules in consumer-goods transactions. The court shall not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

Clearly, the dual status rule was adopted in commercial transactions. *See* O.R.C. § 1309.103(F). It is equally as evident, through reading of § 1309.103(H), that whether the dual status rule applies in consumer transactions is left to the courts.

From a bankruptcy viewpoint, emerging positions on the question reject the dual status rule. *See* Price, 2007 WL 664535; Peaslee, 2006 WL 3759476; *cf.* Wible, Case No. 06-40017 (unpublished); Graupner, 2006 WL 3759457. Instead, bankruptcy courts favor the transformation rule, finding its application to be easier. *See* id. Under the transformation rule, a mixed transaction results in loss of the purchase money security protection. In the absence of the purchase money security interest, the hanging paragraph

does not apply and strip-down of the lien is permissible based on the value of the collateral.

This is also most consistent with construction of Ohio Revised Code § 1309.103(A)(2)'s requirement that value be given to "enable" the purchase. The term "enable" must be given full effect. Enabling in an everyday street usage means anything that makes something possible. This is the practical sense of enabling. The use of the word in the context of the statute implies the legal sense of the word, which is a sense of what is required to legally authorize or fulfill the legal requirements. This is the difference between a practical definition or a legal definition of enabling. In the context of an automobile purchase, payment of sales tax and a fee for issuance of the certificate of title are necessary to legally authorize the sale and to fulfill the legal requirements. For example, the Enabling Act of 1802 authorized the admission of Ohio into the United States while establishing the legal requirements to be fulfilled. Adopting a practical definition would allow payment of an endless string of expenses that made it possible for a debtor to acquire the vehicle. The debtor would not have made it to the dealer's lot were it not for the emergency appendectomy, therefore payment of the doctor's outstanding fee would certainly cover an enabling expense. A legal definition is far more workable and historically consistent than a practical definition which would quickly prove to be impractical. Moreover, a legal definition harmonizes the transformation rule with the Uniform Commercial Code section (O.R.C. § 1309.103) and Official Comment 3.

Looking at Ohio law, available case law is extremely limited, particularly following adoption of the 2001 amendments to Chapter 1309 of the Ohio Revised Code. One post-2001 state court case which did specifically address the two rules was a commercial case and therefore is of limited value. *See* Key Bank Nat'l Ass'n v. Huntington Nat'l Bank, 2002 WL 701941 (Ohio Ct. App. 2002) (referencing, in a commercial case, that the transformation rule was rejected with the 2001 amendments to the Ohio Revised Code). Although cases prior to 2001 are sparse, there is support for adoption of the transformation rule. *See, e.g.,* In re Keeton, 161 B.R. 410 (Bankr. S.D. Ohio 1993) (adopting transformation rule in context of consumer goods refinancing fact pattern). However, there is also an argument for the proposition that a loan can have both purchase money and nonpurchase money components. *See, e.g.,* In re Krueger, 172 B.R. 572 (Bankr. N.D. Ohio 1994).

Absent clear guidance from Ohio courts, and under the clear authority of O.R.C. § 1309.103(F), the court would be inclined to adopt the transformation rule. First, as other recent bankruptcy courts have noted, adoption of the transformation rule will avoid certain application problems intrinsic to the dual-status rule. *See* Price, 2007 WL 664535; Peaslee, 2006 WL 3759476; Keith G. Meyer, A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code, 50 U. Kan. L. Rev. 143 (2001). Second, the transformation rule is arguably more appropriate in consumer transactions where there is often a vast difference in the level of sophistication between the parties.

The effect of the transformation rule is that the existence of both purchase money and nonpurchase money obligations in the transactions results in a conversion of all the obligations to nonpurchase money obligations. Since purchase money obligations do not

exist, creditors do not hold purchase money security interests. The result renders the "hanging paragraph" inapplicable to creditors' claims. Thus, the claims are subject to cramdown under the authority of 11 U.S.C. §§ 506 and 1325(b).

## II. Possible Interpretations

The court finds that Ohio law would impel the conclusion that these are not purchase money obligations. This assumes the answer to the unspoken question: is Ohio law binding? Put differently, are federal courts free to create a federal definition of purchase money security interest solely for application in section 1325(a)(9)?

Such a definition solely for this purpose does not appear to intrude upon the state law of exclusivity for determining property rights. Moreover, it would allow for an interpretation free from rules that were used to create a definition in another context. The various state law definitions have been passed for a number of different reasons, but we can be certain that how it would affect a bankruptcy cramdown was never a consideration.[5]

There would be clear advantages and disadvantages to the suggested approach. The court will allow each party until April 30, 2007 to address the question whether the court may develop a federal, bankruptcy law definition of purchase money security interest solely for application in section 1325(a)(9) and, if the answer is yes, how such a definition would be applied to decide the present case.

## CONCLUSION

Creditors financed a transaction which allowed debtors to purchase a new car while "selling" their old car to the dealership. If Ohio law is employed to define "purchase money security interest," the court concludes that the amount paid on the negative equity of the trade-in was not a necessary fee or expense which enabled debtors to obtain rights to the collateral. As a result, the payment of the negative equity was not a purchase money obligation. Since the collateral only provides security to the extent the vehicles were purchase money collateral, the portion of the loan paid in the negative equity is not a purchase money security interest. The portion of the loan which did allow debtors to buy a new vehicle, however, is a purchase money obligation secured by the collateral and does qualify as a purchase money security interest.

When a transaction is "mixed," or has both purchase money and nonpurchase

---

[5] A brief review of cases reveals that little attention has been paid to this issue in the post-BAPCPA cramdown cases. A great deal of attention has not usually been paid to similar issues in the past. "The term "rights" is nowhere defined in the Bankruptcy Code. In the absence of a controlling federal rule, we generally *assume* that Congress has 'left to the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.'" Nobleman v. American Sav. Bank, 508 U.S. 324, 329 (1993) (citations omitted) (emphasis added). Questions leap to mind when reviewing passages in which similar issues have been considered. *See* Butner v. United States, 440 U.S. 48, 54-55 (1978).

money components, the entire transaction is transformed into a nonpurchase money transaction as allowed by O.R.C. § 1309.103(F). Thus, creditors' loans to debtors are nonpurchase money transactions not subject to the hanging paragraph following 11 U.S.C. § 1325(a)(9). Inapplicability of the hanging paragraph results in the permissible bifurcation of 910 vehicle claims under 11 U.S.C. § 506. In other words, the vehicle loans are subject to cramdown.

However, the court has not been advised whether resorting to Ohio law for the definition of "purchase money security interest" is either necessary or wise. Instead, the court questions whether there is an opportunity to develop a definition, strictly for application under 11 U.S.C. § 1325(a)(9), to embody the spirit of the amendments and provide a base for logical application in the chapter 13 context. The court will provide an opportunity for the parties to brief this issue by no later than **April 30, 2007**.

An order in accordance with this opinion shall be entered immediately.

/s/ Russ Kendig

RUSS KENDIG  
U.S. BANKRUPTCY JUDGE  

MAR 3 0 2007

**Service List**:

Theodore A. Konstantinopoulos  
Lindsey Hall  
Javitch, Block & Rathbone  
1300 East Ninth St., 14th Floor  
Cleveland, OH 44114-1503

Charles C. Butler  
Bish, Butler & Thompson, Ltd.  
1210 West High St.  
Bryan, OH 43506

James F. Ciccolini  
209 S. Broadway St.  
Medina, OH 44256

Jamie Allen Westfall  
Angela Ann Westfall  
605 Township Road 150  
Sullivan, OH 44880

Toby L. Rosen  
Charter One Bank Building, 4th Floor  
400 W. Tuscarawas St.  
Canton, OH 44702