UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: ) CHAPTER 13
)
JAMIE ALLEN WESTFALL AND ) CASE NO. 06-60297
ANGELA ANN WESTFALL, )
) JUDGE RUSS KENDIG
)
Debtors. )
) **MEMORANDUM OF OPINION**
)

  This case is before the court on the objections to confirmation filed by creditor Nuvell Credit Corporation ("Nuvell") and creditor WFS Financial, Inc. ("WFS"). Both objections were based on debtors' proposed treatment of the creditors' secured vehicle loans. Through the plan, debtors proposed to bifurcate the loans into secured and unsecured portions. Creditors argued that the language in 11 U.S.C. § 1325(a), the "hanging paragraph," protected their claims from bifurcation because the loans are qualifying purchase money security interests. Toby L. Rosen, chapter 13 trustee ("Trustee") disagreed, contending that the inclusion of negative equity into the loans excepted the loans from the protection of the hanging paragraph based on the definition of the term purchase money security interest.

  In an amended memorandum of opinion entered on May 17, 2007, the court concluded that pursuant to Ohio law the payment of negative equity is not purchase money enabling a purchaser to acquire rights in the purchased vehicle. Consequently, both purchase money and nonpurchase money interests existed in the transaction. After reviewing Ohio law, the court concluded that Ohio would apply the transformation rule to the transaction, which transforms the entire transaction into a nonpurchase money status due to the contamination by a nonpurchase money component, thereby removing the transaction from the benefit of the hanging paragraph.

  The court requested additional briefing on one issue: whether it is appropriate to use state law to define purchase money security interest or, as an alternative, whether it is superior to use a federal definition solely to interpret and apply the hanging paragraph in the bankruptcy code ("Code"). This issue is now before the court. Nuvell submitted an additional brief on April 27, 2007, as well as four filings of supplemental authority, the latest dated July 30, 2007. WFS[1] and Trustee also filed pleadings in support of their respective positions.

  The court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. The following constitutes the court's findings of fact

---

[1] WFS joins in Nuvell's brief, so the court will refer only to Nuvell's brief in the context of this opinion.

and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The facts were adequately set forth in the court's previous entry.

## DISCUSSION

The issue before the court is whether state or federal law should define the term purchase money security interest as it is used in 11 U.S.C. § 1325(a). To date, the decisions on this issue have drawn from individual state law, specifically the state statutes adopting Revised Chapter 9 of the Uniform Commercial Code (hereafter "UCC"). *See, e.g.*, Citifinancial Auto v. Hernandez-Simpson, 369 B.R. 36, 45 (D. Kan. 2007) (stating that "[t]he law of the State of Kansas is applicable here, as the transaction occurred in Kansas"); Graupner v. Nuvell Credit Corp., 2007 WL 1858291 (M.D. Ga. 2007) (reporter citation not yet available) (utilizing Georgia law, but also relying on definitions contained in the federal Truth in Lending Act and Georgia Motor Vehicle Sales Finance Act); In re Cohrs, 2007 WL 2186135 (Bankr. E.D. Cal. 2007) (reporter citation not yet available) (finding that, "logically," must look to law governing the parties' contract, California Commercial Code § 9103); In re Pajot, 371 B.R. 139 (Bankr. E.D. Va. 2007) (Virginia); In re Petrocci, 370 B.R. 489 (Bankr. N.D.N.Y. 2007) (New York); In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007) (North Carolina); In re Bray, 365 B.R. 850 (Bankr. W.D. Tenn. 2007) (Tennessee).

The absence of a clear state law definition of purchase money security interest and conflicting state law definitions have resulted in disparate treatment of creditors' claims. In some cases, courts found that the negative equity was part of the purchase money security interest and therefore creditors were entitled to the benefits of the hanging paragraph. *See, e.g.*, General Motors Acceptance Corp. v. Peaslee, 2007 WL 2318071 (W.D.N.Y. 2007) (reporter citation not yet available); Graupner, 2007 WL 1858291; Cohrs, 2007 WL 2186135; Petrocci, 370 B.R. 489. In others, courts determined that the payment of the negative equity on an existing loan is not value given to enable the purchase of the new vehicle and concluded that creditors do not have a purchase money security interest to the extent of the loan amount. *See, e.g.*, Citifinancial Auto, 369 B.R. 36; Pajot, 371 B.R. 139; Price, 363 B.R. 734; In re Acaya, 369 B.R. 564 (Bankr. N.D. Cal. 2007); In re Bray, 365 B.R. 850; In re Vega, 344 B.R. 616, 622 (Bankr. D. Kan. 2006). The latter decisions lead to an inquiry on how to treat partial purchase money security interests, which causes further divergences in the treatment of creditors' claims. *See, e.g.*, Citifinancial Auto, 369 B.R. 36 (adopting the dual-status rule); Pajot, 371 B.R. 139 (finding that adoption of the dual status rule preserves legislative intent); Price, 363 B.R. 734 (adopting transformation rule because of difficult in tracing payments between the PMSI and non-PMSI portions of the loan); Bray, 365 B.R. 850 (relying on case law to determine that creditor did not have a purchase money security interest in the vehicle because there was no method to determine how the payments had been applied under a dual-status approach); Vega, 344 B.R. 616, 622 (dual status).

The maddeningly inconsistent body of decisions impels the conclusion that a

consistent rule of law is needed. The most logical method of developing a consistent rule would be to develop a federal definition of purchase money applicable only in this narrow context. The question remains whether it is appropriate to apply a federal definition.

In responding to the question posed by the court in its previous opinion, Nuvell argues that Congress did not mandate use of a state law definition of purchase money security interest, so it should be open to a federal interpretation which honors the legislative intent.[2]

Trustee asserts that the adoption of a federal definition would require the court to create federal common law, a practice discouraged by the federal judiciary. According to Trustee, the issue here is not of sufficient magnitude to warrant the creation of a federal definition. Trustee posits that Congress' failure to define the term purchase money security interest demonstrates Congress' desire to resort to state law for the definition.

The Sixth Circuit, relying on United States Supreme Court precedent, defined federal common law as "a rule of decision that amounts, not simply to an interpretation of a federal statute or a properly promulgated administrative rule, but, rather to the judicial creation of a special federal rule of decision." Mickowski v. Visi-Trak Worldwide, LLC, 415 F.3d 501, 511 (6th Cir. 2005) (citing Atherton v. Federal Deposit Ins. Corp., 519 U.S. 213, 218 (1997)). The court opined that cases which required application of federal common law would be limited. Id. at 511 (quoting O'Melveny & Myers v. FDIC, 512 U.S. 79, 87 (1994)); see also Texas Ind. Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641 (1981) (stating "absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases."). The Sixth Circuit further advised that "normally, when courts decide to fashion rules of federal common law, 'the guiding principle is that a significant conflict between some federal policy or interest and the use of state law . . . must first be specifically shown.'" Visi-Trak. at 511 (quoting Atherton, 519 U.S. at 218 and Wallis v. Pan Am. Petroleum Corp., 384 U.S. 63, 86 (1966)). Thus, it is necessary to determine if this matter involves the creation of federal common law.

Application of the hanging paragraph hinges on the undefined term, purchase money security interest. Since the term is central to the application, any attempt to define the term naturally clarifies the hanging paragraph. The line between interpretation and decision is indistinct. Upon consideration, however, the court is not convinced that assigning a definition to the term is the equivalent of reaching a federal rule of decision, although the court recognizes that a federal interpretation will result in a body of decision. This inquiry misses its goal. Instead, the question should be narrowed to whether it is appropriate to resort to defining the term at the federal level, or whether multiple, varying state law definitions should be used.

---

[2] Much of Nuvell's supplemental brief is of little help in deciding the question posed by the court. Nuvell focused on urging the court to reconsider its previous interpretation of Ohio law.

Recently, the Eleventh Circuit Court of Appeals explored the federal law/state law dichotomy. *See* Dzikowski v. Northern Trust Bank of Florida (In re Prudential of Florida Leasing, Inc.), 478 F.3d 1291 (11th Cir. 2007). In Prudential of Florida Leasing, the issue was whether the bankruptcy court should use Florida law to interpret 11 U.S.C. § 550(d), involving the principle of single satisfaction. The facts and issues in the case were explained in the first paragraph of the opinion:

> The question in this appeal is how the rule of single satisfaction for claims brought by a bankruptcy estate should be applied to 11 fraudulent transfers that were at least partially satisfied in a settlement of a lump sum of $3.9 million involving 377 transfers and several other parties. *See* 11 U.S.C. § 550(d). Patricia Dzikowski, as Chapter 7 Trustee for the estate of Prudential of Florida Leasing, appeals the summary judgment in favor of Northern Trust Bank of Florida and against her complaint to avoid the 11 fraudulent transfers and recover approximately $900,000 of the debtor's estate. The bankruptcy court applied Florida law and credited the entire amount of the settlement to the Trustee's claims against Northern Trust, and the district court affirmed. Because we conclude that the federal rule of single satisfaction required the bankruptcy court to allocate the amount of the settlement that applies to the complaint against Northern Trust rather than apply Florida law, we reverse and remand.

As the court pointed out, "[a]lthough federal law governs the interpretation of a federal statute, sometimes federal law provides a uniform common law rule and other times federal law adopts a state law as the federal rule of decision." Id. at 1298 (citing U.S. v. Kimbell Foods, Inc., 440 U.S. 715, 727-28 (1979).

The Eleventh Circuit Court of Appeals laid out the legal backbone for determining when state law should be applied:

> '[F]ederal courts should "incorporat[e] [state law] as the federal rule of decision," unless "application of [the particular] state law [in question] would frustrate specific objectives of the federal programs." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991) (citations omitted) (alterations in original). The presumption in favor of state law 'is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.' Id. The Bankruptcy Code is often interpreted by reference to state law because the Code is built on pre-bankruptcy commercial relationships and the property rights arising from those relationships. *See, e.g.,* Butner v. U.nited States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)

(property interests); In re Connor, 733 F.2d 1560, 1562 (11th Cir. 1984) (lien priorities). There are nevertheless instances where applying the Code requires a uniform rule of federal common law. *See, e.g.,* In re Columbia Gas Sys., Inc., 997 F.2d 1039, 1055 (3d Cir. 1993) (bankruptcy property rights in oil and gas refunds defined by federal common law) . . . . The decision 'to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interest and to the effects upon them of applying state law.' Kimbell Foods, 440 U.S. at 728, 99 S.Ct. At 1458 (citation and quotation marks omitted). We must consider the need for uniformity, whether application of state law frustrates important federal policies, and the impact of federal common law on preexisting commercial relationships premised on state law. *See* Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1501 (11th Cir. 1996).

Prudential of Florida Leasing, 478 F.3d at 1298.

The first point for consideration under Prudential of Florida Leasing concentrates on uniformity. In this case, the argument for uniformity would encourage adoption of a definition of purchase money security interest to promote similar treatment of debtors and creditors. The Sixth Circuit Court of Appeals discussed the concept of uniformity in Mickowski v. Visi-Trak Worldwide, LLC, and ultimately discounted its influence when considering an issue involving successor liability. In Visi-Trak, the court was faced with the issue of whether the standard for successor liability should be based on the federal "substantial continuity" test or the state "mere continuity" test. The court determined that "[a]n asserted need for absolute uniformity in the collection of patent judgments, without more, is insufficient in itself to justify resort to common law." Visi-Trak, 415 F.3d at 512. Instead, the court required a showing that "the failure to adopt a uniform federal standard for successor liability will somehow inhibit patent rights generally." Id.

The Supreme Court said that an appeal for uniformity does not "prove its need." Atherton, 519 U.S. at 220 (citing United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979); O'Melveny, 512 U.S. at 88)). Consequently, the fact that debtors and creditors are subjected to different treatments, based on the diverse definitions under state law, does not mandate adoption of federal common law. Rather, courts give regard to uniformity as a key factor when there is a threat that a federal right would be impinged or diminished. Put another way, "a conflict is found where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 2 Norman J. Singer, Sutherland Statutory Construction § 36:9 (6th Ed. 2006) (footnote omitted); *see also* Barnett Bank of Marion Co., N.A. v. Nelson, 517 U.S. 25 (1996) (citations omitted). No such federal right is at stake in this instance.

The next inquiry under Prudential of Florida Leasing involves looking at the core federal policies of the statute and deciding whether the use of state law impermissibly

abridges the policies. In the Sixth Circuit, in the context of conflict preemption, this is described as "where it is impossible to comply with both federal and state law, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 425 (6th Cir. 2000) (citing Bibbo v. Dean Witter Reynolds, Inc., 151 F.3d 559, 562-63 (6th Cir. 1998)).

Fully answering this question as to the purposes and objectives of Congress would require an analysis of what Congress meant to say as opposed to what Congress said. As several courts have recognized, the Congressional intent behind the hanging paragraph is unclear:

> To the extent that it is possible to glean any Congressional intent behind the hanging paragraph, *see* In re Quick, - - - B.R. - - -, 2007 WL 1941749, at * 2 (10th Cir. BAP 2007) (noting "the sparse legislative history of the amendment of § 1325"); Horr v. Jake Sweeney Smartmart, Inc., No. 1:07-CV-00010, 2007 WL 1989611, at *4 (S.D. Ohio July 6, 2007) ("there is very little evidence to reflect what Congress intended by the language it chose to enact in the hanging paragraph") . . . .

*See* General Motors Acceptance Corp. v. Peaslee, 2007 WL 2318071 at *7. Although the District Court for the Western District of New York determined that the intent of the hanging paragraph "seems to be to protect creditors from the abuse of 'cramdown,'" because of the limited legislative history, the intent is less than clear. Id. (citations omitted). While most courts conclude that the intent of the hanging paragraph was to protect creditors from cramdown, *see* id. (citations omitted), there is no way to delineate the extent of the protection. Without legislative intent, it is impossible to do anything but fabricate interpretations. The court cannot head down that path as it is limited to the words of the statute. *See* Sparks v. HSBC Auto Fin., 2007 WL 2080289 (S.D. Ohio 2007).

The final consideration to determine whether a federal definition is appropriate requires the court to look at "the extent to which application of a federal rule would disrupt commercial relationships predicated upon state law." Kimbell Foods, 440 U.S. at 729 (footnote and citations omitted). This does not appear to be a problem as the Code previously bifurcated claims. The cramdown of claims permitted under the bankruptcy code certainly disrupted transactions traditionally governed by state law, so a federal definition would require no greater disruption than previously existed.

Thus, the established standard for adopting state law, either as a rule of decision or otherwise, is a muddle on the current facts. One could argue whether or not the muddle constitutes a failure to pass the test, much like a failure to carry a burden of proof. We need not attempt to decide who has the burden and therefore succeeds on such marginal grounds. Rather, the ill-fitting drape of the rule of decision cloth serves as proof of the necessity of an exception on these unique facts. The state law standard should not be used for reasons that may be titled as the excluded purpose exception.

Excluded purpose means that a state statute should not serve as a federal rule of decision if the federal purpose was excluded from the state law. That is the case in the state law definition of purchase money. The intent of the framers of the Uniform Commercial Code is quite clear: the state law definition of purchase money security interest was not meant to apply to bankruptcy law. Official Comment 8, titled "Consumer-Goods Transactions; Characterizations Under Other Law," discusses section 9-103(h) and provides, in pertinent part:

> This section addresses only whether a security interest is a "purchase-money security interest" under this Article, primarily for purposes of perfection and priority. See, e.g., Sections 9-317, 9-324 . . . . Whether a security interest is a "purchase-money security interest" under other law is determined by that law. For example, decisions under Bankruptcy Code Section 522(f) have applied both the dual-status and the transformation rules. The Bankruptcy Code does not expressly adopt the state law definition of "purchase-money security interest." Where federal law does not defer to this Article, this Article does not, and could not, determine a question of federal law.

U.C.C. § 9-103 (2001), Official Comment 8.[3]

It is important to note that this quotation is from the Official Comments ("Comments") to the UCC. The drafters recognized that the Bankruptcy Code did not expressly defer to the state law definitions of purchase money security interest. These comments carry a ponderous significance. Using the state law definition of purchase money security interest may well abridge the federal policies, especially since the state statute was not intended for the issue before the court, but was intended to be used only for matters involving perfection and priority. Consequently, there is strong reason to use a federal, and not a state, application in this context.

A bit of history is important to fully appreciate the Comment. The UCC was a joint project of the National Conference of Commissioners on Uniform State Laws and the American Law Institute. It rewrote a vast swath of American commercial law and "given its scope and the economic importance of the transactions it covers . . . is a remarkable achievement in private law making in the United States." Fred H. Miller, *Modernizing the UCC for the New Millennium: Introduction to a Collection on the New UCC*, 25 Okla. City. U.L. Rev. 189, 190 (2000).

The UCC was not a product of just one interest group or any particular component of the legal profession or of the commercial community. It was refined by all elements of the commercial legal community including practicing attorneys, judges, law professors and others. Id. The care and depth of review cannot be overstated. "No piece of

---

[3] The Official Comments to the UCC will hereafter be referred to as "Comment" or "Comments."

legislation was ever considered as carefully by as many of the topflight lawyers of the country as the Uniform Commercial Code." William A. Schnader, *A Short History of the Preparation and Enactment of the Uniform Commercial Code*, 22 U. Miami L. Rev. 1, 10 (1967).

Although it was decided that the comments would not be given binding effect, Sean Michael Hannaway, *The Jurisprudence and Judicial Treatment of the Comments to the Uniform Commercial Code*, 75 Cornell L. Rev. 962, 967-70 (1990), commentators have noted that courts defer to them. Id. at 962. Even those who oppose the influence of the Comments appear to view them as the most influential interpretive source. Nigel Stark, *Unofficial Official Comments*, 11 Tex. Rev. L. & Politics 480 (2007).

It is critical to note that not using the state law meaning in bankruptcy cases as advanced by Comment 8 does not involve the most common objection to use of the Comments. This use does not violate the plain meaning doctrine. This criticism underlies the argument of those that wish to minimize use of the Comments. Id. The reason this does not violate plain meaning is that the Comments are not being used to interpret the statute. Rather, the Comments are used solely to illuminate that the obvious state law purpose was the only purpose for the statute and that the statute's use elsewhere would be beyond its literal scope as the law of the state and beyond its intended scope of purpose.

Historical and logical imperatives compel consideration of the Comments in the current situation. "Nearly forty years of experience has shown that courts defer, and, this discussion will argue, *ought to* defer to the guidance the Comments offer as to the proper application of [Uniform Commercial] Code provisions. The Comments occupy an unusual position as aids to statutory interpretation." Hannaway at 962.

There are many reasons why the Comments enjoy such a status. The Comments are not legislative history, which may be nothing more than the stray thoughts, or statements, of one of hundreds of legislators. Rather, they are the considered, and actively negotiated, explanations of the entire spectrum of the brightest minds in the field.

The Comments also draw heft from their primary role in the theoretical structure of the UCC. Karl Llewellyn, the UCC's original driving force, viewed the UCC as outlining the law in a manner in which the law would exist in the facts of the particular case and the facts of the case would also inform the law. Hannaway at 965 (citing William L. Twining, *Karl Llewellyn and the Realist Movement*, 223-26 (1973); Richard Danzig, *A Comment on the Jurisprudence of the Uniform Commercial Code*, 27 Stan. L. Rev. 621, 624-26 (1975); John L. Gedid, *U.C.C. Methodology: Taking a Realistic Look at the Code*, 29 Wm. & Mary L. Rev. 341, 363 (1988)).

The UCC is an intentionally flexible document so that the law remains consistent with contemporary commercial practice instead of insisting on stagnant commercial practices that must stand still to conform with yesterday's rules. What is in good faith or reasonable changes as time goes by and thus the UCC empowers commerce instead of serving as a barrier to commercial evolution.

> The Comments, under this view, do not merely serve
> as simple aids to understanding the [Uniform Com-
> mercial] Code, but are an indispensable part of the
> UCC framework. First, given the intentional flexibi-
> lity built into the [Uniform Commercial] Code, they
> provide a necessary element of consistency. The
> drafters designed them to provide a bridge between
> often confusing or sparse [Uniform Commercial]
> Code language and the facts of specific cases.
> Second, based on the principle of patent reason, the
> Comments provide a ready reference to the policy and
> purpose of particular provisions and their relationship
> to other provisions so as to tie the purposes and policies
> of disparate sections together.

Hannaway at 967.

This decision does not depend upon accepting any particular view of the role of the UCC or the Comments. There is nothing that requires or implies the use of the state law UCC definition of the term purchase money in federal bankruptcy law. Use of the Comments just points out that the courts should not use this state law meaning when it is not required and the brightest minds in the land have told us of its limited purpose. We should not select state law merely because it is convenient and familiar any more than a workman should use a fine micrometer as a small hammer because it is convenient and familiar. The intended function of the tool must inform us as to its use.

This conclusion is buttressed by the fact that this case presents the confounding problem of applying a state law definition when that definition was specifically left undetermined due to what appears to be the UCC drafters' intentional non-decision. Ohio, through its adoption of the U.C.C. § 9-103, adopted a "Pontius Pilate" provision by intentionally leaving the effect of clearly known recurring fact patterns unresolved:

> (H) The limitation in divisions (E), (F), and (G) of this section to
> transactions other than consumer-goods transactions is intended to
> leave to a court the determination of the proper rules in
> consumer-goods transactions. The court shall not infer from that
> limitation the nature of the proper rule in consumer-goods
> transactions and may continue to apply established approaches.

O.R.C. §1309.103(H). The state law cases are less than enlightening and far from comprehensive. Attempting to divine state law is an exercise in fiction. This court previously attempted to divine state law on the subject, but this effort was similar to divining water with a forked stick. There was little precedent to interpret an intentionally vague statute that had not been drafted with future bankruptcy law revisions in mind. The result of a good faith effort, enforcement of the transformation rule, appears unnecessarily harsh. There is little precedent supporting some rule of reason to logically say what is or is not a purchase money component on an item by item basis leaving an unnecessarily zero sum game. Simply, state law does not support uniformity or advance the intent of the drafters of either the UCC or the Bankruptcy Code. Adoption of the Pontius Pilate

provision indicates that there is no strong state interest either way.

       Although the court continues to hold that negative equity is not part of a purchase money security interest, after thorough consideration, and with particular appreciation of the Comments accompanying the Revised Uniform Commercial Code, the court adopts use of the dual status rule for the purposes of the hanging paragraph. Simply, application of the transformation rule is too severe. There is no question that the transactions at issue include partial purchase money security interests. In light of the ability to frame a federal understanding of the term purchase money security interest, the court finds adoption of the dual status rule is more equitable. In applying the rule, the court finds that the subject transactions will have purchase money components, which will be secured and not subject to bifurcation, and nonpurchase money components (arising from the payment of negative equity), which will be subjected to bifurcation as general unsecured claims. To determine the amounts of each, the court will employ a simple percentage formula based on the original transaction. The same percentage will be applied to the claim balance to determine the amount of the secured claim and the amount of the secured claim. For example, in the WFS transaction, debtors borrowed $26,189.49 and $6,757.62 of the loan was used to pay the negative equity on their trade-in, representing 25.8% of the loan. This percent represents the portion of the loan subject to bifurcation. WFS filed a proof of claim for $25,631.03. After applying the percentage, the court finds that WFS would have an unsecured claim for $6,612.81 and a secured claim for $19,018.22.[4]

       Additional reflection also leads the court to conclude that application of the dual status rule will have positive implications for both parties involved in similar transactions. First, recognition of the partial purchase money security interest will prevent car buyers from purchasing a car and shortly thereafter filing a chapter 13 proceeding in order to be rid of a substantial portion of the debt through section 506 bifurcation. Instead, the purchase money security interest will be protected by the hanging paragraph. Second, use of the dual status rule may discourage lenders from promoting excessive spending by allowing the financing of larger and larger amounts of negative equity. The court has witnessed amounts of negative equity that most reasonable persons would find unimaginable. This is not surprising given that 80% of car loans are for terms exceeding four years, contributing to the slow buildup of equity in vehicles, and that one source estimates that over one in four cars that are financed include negative equity. Liz Pulliam West, MSN Money, *The Real Reason You're Broke* (2007), http://articles.moneycentral.msn.com/savinganddebt/saveonacar/therealreasonyourebroke.aspx (citing Edmunds.com research). The products sold by car dealerships only increase the burden and these sale add-ons are likely to increase as it is reported that finance and insurance sales have regularly accounted for over 40% of car dealerships' profits. Featured Statistic, *F & I Contributions to Dealership Profits*, F & I Management and Technology Magazine, http://www.fi-magazine.com/t_inside.cfm?action=statistics (citing Source:CNW Marketing/Research). Third, in the modern system of national lending, this makes uniformity possible rather than multiple state rules.

---

[4] Nuvell loaned debtors $18,723.65; $3,588.47 was used to pay the negative equity on a trade-in vehicle. Thus, 19.2% of the original loan was nonpurchase money. Nuvell filed a claim for $18,289.82. Applying the applicable percentages, Nuvell is entitled to a secured claim in the amount of $14,778.17 and an unsecured claim of $3,511.65.

The court does not attempt to resolve every potential case that may arise, such as the impact of various goods or services that may be sold by a car dealer or the rare instance in which a car may be worth more than the dual status balance. These are matters for the typical case law process.

## CONCLUSION

After examining all three elements, the court finds that it can utilize a federal understanding of purchase money security interest for purposes of applying the hanging paragraph. Although a federal right is not at stake, thereby discouraging use of a federal definition, the other two prongs fall in favor of a federal interpretation. While legislative intent is not clear, the intent of the Revised Uniform Commercial Code is clear and it supports a federal, and specifically bankruptcy, definition of purchase money security interest for section 9-103. Neither will a federal definition engender upheaval of commercial transactions.

Consequently, the court hereby adopts its previous decision to the extent that it found that negative equity was not part of the value given to enable debtor to acquire rights in the vehicle. However, the court concludes that adoption of the transformation rule is not apropos. While such a conclusion may have been compelled by an understanding of Ohio law, the court is not constrained to apply Ohio law when the Ohio law expressly cabins itself to non-bankruptcy issues. The court finds that use of the dual status rule results in a more equitable outcome.

An order in accordance with this opinion shall be entered immediately.

SEP 2 4 2007

/s/ Russ Kendig

RUSS KENDIG
U.S. BANKRUPTCY JUDGE

**Service List**:

Theodore A. Konstantinopoulos
Lindsey Hall
Javitch, Block & Rathbone
1300 East Ninth St., 14th Floor
Cleveland, OH 44114-1503

Charles C. Butler
Bish, Butler & Thompson, Ltd.
1210 West High St.
Bryan, OH 43506

James F. Ciccolini
209 S. Broadway St.
Medina, OH 44256

Jamie Allen Westfall
Angela Ann Westfall
605 Township Road 150
Sullivan, OH 44880

Toby L. Rosen
Charter One Bank Building, 4th Floor
400 W. Tuscarawas St.
Canton, OH 44702