06-60297

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| In re: JAMIE ALLEN WESTFALL; ANGELA ANN WESTFALL,<br>                               *Debtors.*<br><br>NUVELL CREDIT CORPORATION, nka Nuvell Credit Company LLC,<br>                               *Appellant,*<br><br>v.<br><br>JAMIE ALLEN WESTFALL; ANGELA ANN WESTFALL; TOBY L. ROSEN, Chapter 13 Trustee,<br>                               *Appellees.* | No. 08-4530 |

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-03322—Christopher A. Boyko, District Judge.

Argued: December 3, 2009

Decided and Filed: March 24, 2010

Before: BOGGS and COOK, Circuit Judges; COLLIER, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Barkley Clark, STINSON MORRISON HECKER LLP, Washington, D.C., for Appellant. George Max Reiber, LAW OFFICE, Rochester, New York, for Appellees. **ON BRIEF:** Barkley Clark, Katherine M. Sutcliffe Becker, STINSON MORRISON HECKER LLP, Washington, D.C., Jeffrey A. Lipps, Angela M. Paul Whitfield, CARPENTER & LIPPS LLP, Columbus, Ohio, for Appellant. Robert P. Harbert, OFFICE OF THE U.S. TRUSTEE, Canton, Ohio, for Appellees. James R. Bruinsma,

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

MYERS NELSON DILLON & SHIERK, PLLC, Grand Rapids, Michigan, for Amicus Curiae.

## OPINION

COOK, Circuit Judge. Nuvell Credit Corporation (Nuvell) appeals from a judgment of the United States District Court for the Northern District of Ohio affirming the bankruptcy court's order overruling Nuvell's objection to confirmation of the Chapter 13 plan filed by debtors Jamie and Angela Westfall (Debtors). This appeal concerns whether the protection from "cramdown" offered by the so-called "hanging paragraph" of 11 U.S.C. § 1325(a) applies to the portion of a creditor's secured claim attributable to the payoff of negative equity in a trade-in vehicle. Because we find that negative equity financing constitutes a purchase money obligation under the Uniform Commercial Code (UCC) and thus that the associated security interest satisfies the UCC's definition of a purchase money security interest, we hold that the portion of a creditor's secured claim attributable to the payoff of negative equity qualifies for protection from cramdown under the hanging paragraph, and accordingly REVERSE.

I.

On May 31, 2005, Debtors purchased a Chevy Silverado pickup for their personal use from Jack Matia Chevrolet and, in connection with the purchase, traded in a 2001 Chevy Blazer subject to an existing lien of $9,588.47. The dealer granted a $6,000 gross trade-in allowance for the Blazer, leaving negative equity—the amount needed to extinguish the lien—of $3,588.47.[1] Debtors entered into a Retail Installment Sale Contract (RISC) documenting their purchase of the Silverado, financed a total of

---

[1] The parties dispute whether an additional manufacturer's rebate of $3,500 should apply to further reduce the amount of negative equity to $88.47. The bankruptcy court did not factor in the manufacturer's rebate and found the negative equity amount to be $3,588.47. Nuvell did not raise this issue during the appeal to the district court, thus forfeiting it. In any event, because we hold that negative equity financing qualifies for protection from cramdown, the entire amount of Nuvell's claim receives secured treatment regardless of the size of the negative equity portion, rendering this issue irrelevant.

$18,723.65 (including the negative equity), and granted the dealer a security interest in the vehicle. The dealer assigned the RISC to Nuvell.

Debtors filed a Chapter 13 petition on March 13, 2006, within 910 days of executing the RISC. Seeking to retain the Silverado, Debtors' fourth amended Chapter 13 plan assigned a secured value of $14,701.89—the balance owed, minus negative equity—to Nuvell's claim, proposing to pay that amount with 7% interest, while treating the remainder as a general unsecured claim, which the plan offered to pay at 40 cents on the dollar. Nuvell objected to confirmation, and, after several hearings, the bankruptcy court determined that the portion of Nuvell's security interest attributable to negative equity did not qualify as a purchase money security interest and instead applied the "dual status" rule to apportion Nuvell's claim between secured and unsecured. Nuvell appealed to the district court, which affirmed the bankruptcy court's judgment. This timely appeal followed.

II.

In an appeal from a district court's review of a bankruptcy court order, we review the bankruptcy court's order directly, giving no deference to the district court decision. *In re Hamilton*, 540 F.3d 367, 371 (6th Cir. 2008). Because this appeal asks a question of law (interpretation of the Bankruptcy Code), we review de novo. *Phar-Mor, Inc. v. McKesson Corp.*, 534 F.3d 502, 504 (6th Cir. 2008) (citing *In re S. Air Transp., Inc.*, 511 F.3d 526, 530 (6th Cir. 2007)); *see also Rittenhouse v. Eisen*, 404 F.3d 395, 396 (6th Cir. 2005).

A.

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the Bankruptcy Code generally allowed Chapter 13 debtors to modify the rights of a secured creditor holding a purchase money security interest in a vehicle by bifurcating the creditor's claim into secured and unsecured portions, with the secured amount determined by the vehicle's fair market value on the petition date and the excess classified as an unsecured claim. *See* 11 U.S.C.

§§ 506(a)(1), 1325(a). After bifurcating the claim, the debtor could treat the secured and unsecured portions separately in accordance with the priority scheme established by the Code. The bankruptcy court could then confirm the debtor's plan over the objection of the affected secured creditor as long as the creditor received a lien securing the claim, along with payments over the life of the plan equal to the present value of the allowed secured claim, i.e., the present value of the collateral. *See* 11 U.S.C. § 1325(a)(5)(B); *Rake v. Wade*, 508 U.S. 464, 469 (1993). This process, known in bankruptcy parlance as "cramdown," essentially permitted a debtor to strip a secured creditor's lien down to the value of the collateral, with the remaining balance receiving payment on a pro-rata basis as an unsecured claim pursuant to the terms of the plan, and, to the extent not satisfied, subject to discharge. Thus, by employing cramdown, a debtor could force a secured creditor to accept less than the full value of its claim.

B.

With BAPCPA, Congress amended the Code to prevent the cramdown of certain secured consumer obligations. The relevant provision appears as an unnumbered paragraph following § 1325(a), now commonly referred to as the "hanging paragraph," which states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a).

In a recent decision addressing the hanging paragraph's impact on debtors proposing to surrender their vehicles in full satisfaction of the creditor's claim, this court described the legislative purpose behind the hanging paragraph:

> The hanging paragraph eliminates the cramdown occurring under § 1325(a)(5)(B) by eliminating bifurcation under § 506. Without § 506,

>  creditors falling within the scope of the hanging paragraph are fully secured so that when a debtor elects to retain the collateral, the debtor must propose a plan that will pay the full amount of the claim.
>
> . . .
>
> Based upon the legislative history, there is little doubt that the "hanging-sentence architects intended only good things for car lenders and other lienholders."

*In re Long*, 519 F.3d 288, 294 (6th Cir. 2008) (quoting Keith M. Lundin, CHAPTER 13 BANKRUPTCY, 3d ed. 451.5-1 (2000 & Supp. 2007-1)).

Where (instead of surrendering it) the debtor seeks to retain the vehicle through bankruptcy, a creditor whose claim meets the four criteria set forth in the hanging paragraph—(1) the creditor holds a purchase money security interest; (2) the debt was incurred within 910 days of filing; (3) the collateral consists of a motor vehicle; and (4) the debtor acquired the vehicle for his/her personal use—receives protection from bifurcation and cramdown. In this case, the collateral securing Nuvell's claim consists of a motor vehicle Debtors acquired for their personal use within 910 days of filing the petition. Thus, the only disputed issue concerns the extent to which Nuvell holds a "purchase money security interest" (PMSI)—specifically, whether or not the security interest that secures the portion of its claim attributable to negative equity qualifies as a PMSI.

### C.

Where the Code does not define the relevant term, "we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.'" *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993) (quoting *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (alteration in original)). Moreover, "[t]he justifications for application of state law are not limited to ownership interests," but "apply with equal force to security interests." *Butner*, 440 U.S. at 55.

Ohio, like the other forty-nine states, adopted Revised Article 9 of the UCC, to which the courts have looked for a definition of PMSI. *See, e.g., In re Price*, 562 F.3d 618, 625 (4th Cir. 2009) (agreeing "with the great majority of other courts" that "state law controls the meaning of 'purchase money security interest' in the hanging paragraph"). Because Debtors reside in Ohio and purchased the vehicle in question from an Ohio dealer pursuant to a RISC governed by Ohio law, we look to Ohio's UCC to define PMSI.

According to the UCC, "[a] security interest in goods is a purchase-money security interest: (1) [t]o the extent that the goods are purchase-money collateral with respect to that security interest." Ohio Rev. Code § 1309.103(B)(1). "Purchase money collateral" is in turn defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." Ohio Rev. Code § 1309.103(A)(1). And the UCC defines a "purchase-money obligation" as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Ohio Rev. Code § 1309.103(A)(2). Thus, the UCC-derived definition of PMSI focuses on the "purchase-money obligation" that the collateral secures. Under Ohio's two-pronged definition, a transaction gives rise to a PMSI if the obligor incurred the underlying obligation (1) as all or part of the price of the collateral; or (2) for value given to enable the debtor to acquire rights in or the use of the collateral. Comment 3 to UCC 9-103 supplies further interpretive guidance, specifying that:

> Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

Ohio Rev. Code § 1309.103 cmt. 3.

### D.

Applying that definition here, Nuvell's security interest qualifies as a PMSI—and its claim therefore cannot be crammed down and must be paid in full—if Debtors incurred the underlying obligation *either* "as all or part of the price" of the vehicle *or* "for value given to enable" them to acquire rights in or the use of the vehicle. *See In re Dale*, 582 F.3d 568, 573 (5th Cir. 2009) (quoting Tex. Bus. & Com. Code § 9.103).

Debtors argue that negative equity financing defies characterization as "all or part of the price" of the vehicle or as "value given to enable" the acquisition, and therefore that portion of the debt does not fall within the hanging paragraph's protective ambit. They advocate a narrow meaning of "price" akin to the "cash price" of the vehicle, which does not encompass negative equity financing. And they insist that negative equity financing does not qualify as "value given to enable" the acquisition because, although they did not do so, it remains theoretically possible to acquire a new car without trading-in an over-encumbered vehicle.

Nuvell responds that the UCC establishes, and the Ohio Supreme Court recognizes, an expansive definition of "price" that encompasses negative equity financing, *see Johns v. Ford Motor Credit Co.*, 551 N.E.2d 179, 183 (Ohio 1990), and that, in any event, the dealer financed the negative equity on the Debtors' trade-in vehicle precisely to allow Debtors to obtain rights to the vehicle, so it qualifies as "value given to enable" the acquisition. Nuvell further maintains that, because the trade-in played an integral role in the Debtors' new vehicle purchase, the portion of the obligation attributable to negative equity financing bears the requisite "close nexus" with the acquisition needed to generate a PMSI.

The circuit opinions addressing this issue (now numbering seven) uniformly adopt the creditor-friendly position in holding that negative equity qualifies as a PMSI protected from cramdown by the hanging paragraph. *See In re Graupner*, 537 F.3d 1295, 1301 (11th Cir. 2008); *Price*, 562 F.3d at 628; *In re Ford*, 574 F.3d 1279, 1285 (10th Cir. 2009); *In re Mierkowski*, 580 F.3d 740, 743 (8th Cir. 2009); *Dale*, 582 F.3d at 575; *In re Peaslee*, 585 F.3d 53, 57 (2d Cir. 2009); *In re Howard*, No. 09-3181, — F.3d —, 2010 WL 680974, at *5 (7th Cir., Mar. 10, 2010). These decisions generally hold that negative equity meets both the "price" and "value given to enable" prongs of the PMSI definition. We agree, and therefore conclude, in accord with the uniform view of our sister circuits, that the hanging paragraph protects negative equity from cramdown.

1.  Negative Equity Financing Fits Both the "Price" and "Value Given to Enable" Prongs of the PMSI Definition

The statutory language, viewed in light of Comment 3, establishes that "price" and "value given to enable" include numerous expenses not captured by the common understanding of "price," including freight charges, demurrage, administrative charges, expenses of collection and enforcement, and attorney's fees. "Inclusion of these expenses dispels any notion that 'price' and 'value given' are limited to the price tag of the vehicle standing alone." *Dale*, 582 F.3d at 574. After listing specific examples of obligations included in the "price," the Comment recites that the price also encompasses "other similar obligations." Ohio Rev. Code § 1309.103 cmt. 3. This language "demonstrates that the enumerated expenses are merely examples and do not constitute an exhaustive list of eligible expenses." *Dale*, 582 F.3d at 574.

Nor does the doctrine of *ejusdem generis* narrow the types of expenses covered by the Comment to exclude negative equity. That doctrine provides that "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). As the Fifth Circuit observed, "the listed expenses in Comment 3 have no common feature beyond an attenuated connection to the acquisition or maintenance of the vehicle." *Dale*, 582 F.3d at 574.

Because negative equity exhibits a similar connection, *ejusdem generis* does nothing to advance Debtors' position. *Id.* at 574–75. Moreover, even if the doctrine served to narrow the meaning of "other similar obligations," it does not affect the Comment's preceding statement that both price and value given to enable "include[] obligations for expenses incurred in connection with acquiring rights in the collateral." *Id.* at 574 (quoting Tex. Bus. & Com. Code § 9.103 cmt. 3). This represents "a stand alone category of expense," which easily accommodates negative equity. *Id.* at 575. Thus, regardless of whether negative equity financing qualifies as an "other similar obligation," it remains an obligation for an expense "incurred in connection with acquiring rights in the collateral," and satisfies the definition of a PMSI.

Moreover, in *Johns*, the Ohio Supreme Court expressly recognized the integral connection between the payoff of a trade-in vehicle's negative equity and the purchase of a new vehicle on an installment basis:

> It is a matter of common knowledge that most new car sales are accompanied by trade-ins. Inclusion of the negative equity of a trade-in is nothing more than a convenient means of accommodating a buyer who is offering a depreciated trade-in. It is, in other words, a practical method of facilitating the release of an outstanding security interest in order that the trade-in allowance can be made . . . .
>
> Here, appellees were able to purchase the specific automobiles they desired because their trade-ins were afforded more value on paper than they actually had.

*Johns*, 551 N.E.2d at 183. And since the UCC includes within the "price" such disparate items as sales taxes, finance charges, interest, freight charges, costs of storage in transit, collection expenses, attorney's fees, and an open-ended category of "other similar obligations," negative equity financing—according to *Johns*, so vital to facilitating the transaction—readily fits within the meaning of "price" sufficient to generate a PMSI. *See* Ohio Rev. Code § 1309.103 cmt. 3.[2]

---

[2] *Johns* held that parties to a retail installment sale contract may "properly include [negative equity financing] as part of the cash price if agreed to in good faith." *Johns*, 551 N.E.2d at 183. Debtors attempt to distinguish *Johns* by arguing that they and Nuvell did not, as a matter of fact, agree to include the negative equity from the trade-in as part of the cash price. But the import of *Johns*, for purposes of this

And in any event, negative equity separately qualifies for the hanging paragraph's protection by meeting the "value given to enable" prong, which provides that a "purchase-money obligation" consists of "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Ohio Rev. Code § 1309.103(A)(2). The value supplied by the Dealer to fund the payoff of Debtors' negative equity in their trade-in vehicle "enabled" them to purchase the vehicle. The portion attributable to negative equity played an integral role in the overall transaction. Debtors incurred the entire obligation at the same time for the singular purpose of acquiring the new vehicle. Relying on *In re Sanders*, 377 B.R. 836, 856 (Bankr. W.D. Tex. 2007), *rev'd*, 403 B.R. 435 (W.D. Tex. 2009), Debtors argue for a distinction between enabling a *transaction* to occur and enabling the acquisition of *rights* in new collateral, suggesting that negative equity assists only the former. But "[f]rom a practical perspective, that distinction is meaningless." *Price*, 562 F.3d at 625. "If negative equity financing enabled the transaction in which the new car was acquired, then, in reality, the negative equity financing also enabled the acquisition of rights in the new car." *Id.*

Debtors further assert that the negative equity relates to an antecedent debt, and therefore does not qualify as "value given to enable." This argument fails for the simple reason that the portion of Debtors' obligation to Nuvell owed on account of negative equity does not, in fact, amount to a refinance of antecedent debt. *See In re Muldrew*, 396 B.R. 915, 926 (E.D. Mich. 2008). Prior to financing the negative equity in connection with their purchase of the new vehicle, Debtors owed Nuvell nothing. They owed the debt secured by the trade-in vehicle to an unrelated third-party. The obligation secured by the vehicle—including the negative equity portion—consisted of all new credit funded by Nuvell. *See Dale*, 582 F.3d at 575.

---

case, lies not in its holding that negative equity can qualify as part of the cash price, but in its express recognition of the integral connection between negative equity payoffs and vehicle purchases, making clear that negative equity falls within the UCC's meaning of "price."

2.  Negative Equity Financing Bears a "Close Nexus" with the Acquisition of the Collateral

In addition to clarifying the meaning of "price" and "value given to enable," Comment 3 further instructs that a PMSI "requires a close nexus between the acquisition of the collateral and the secured obligation." Ohio Rev. Code § 1309.103 cmt. 3. Financing negative equity as part of a new vehicle purchase enables the purchaser to utilize the value of their trade-in and occurs as part of a single transaction. Releasing the lien on the trade-in vehicle allows the dealer to sell it and, in turn, makes the purchase of the new vehicle possible. As the Eleventh Circuit explained, "[t]he financing was part of the same transaction and may be properly regarded as a 'package deal.' Payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction, and utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle." *Graupner*, 537 F.3d at 1302. Thus, the portion of the secured obligation arising from the negative equity bears a "close nexus" with the acquisition of the collateral. *Id.*; *see also Muldrew*, 396 B.R. at 926 ("A closer nexus to the collateral can hardly be imagined.").

And contrary to Debtors' concerns, treating negative equity financing as a PMSI remains unlikely to encourage predatory lending aimed at turning unsecured antecedent debt into a secured PMSI because the "close nexus" requirement limits the reach of such a holding. *See Price*, 562 F.3d at 627. The pernicious tactics that Debtors warn of—predatory lenders folding pre-existing credit card or other debts into new car purchases—"would present very different circumstances" unlikely to satisfy the "close nexus" requirement. *Id.*

We recognize that, in these circumstances, the UCC and BAPCPA create a creditor-friendly rule. Yet this rule only applies if the debtor chooses to retain the vehicle. The debtor may instead opt to surrender the vehicle in satisfaction of the creditor's secured claim, leaving the creditor with only an unsecured deficiency claim. *See In re Long*, 519 F.3d 288, 297–98 (6th Cir. 2008). The debtor may then provide for partial repayment and discharge of the creditor's unsecured claim on the same terms as

other unsecured claims. *See id.* Thus, by choosing to surrender the vehicle, the debtor can effectively bifurcate the secured creditor's claim and compel the creditor to accept less than the amount owed. This substantially mitigates the impact of the rule recognized here.

### III.

For these reasons, we REVERSE the district court's judgment and REMAND to the bankruptcy court for further proceedings consistent with this opinion.